UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RENEE MOUSA,

              Plaintiff,                                  Case No. 11-14522

                                                        Paul D. Borman
v.                                                     United States District Judge

WAL-MART STORES EAST, L.P.,

              Defendant.
_____/

OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT (ECF NO. 21)

        Before the Court is Defendant Wal-Mart Stores East, L.P.'s Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56(b).  (ECF No. 21.)  Plaintiff filed a response (ECF No. 25) and Defendant filed a reply (ECF No. 30).  The Court held a hearing on May 2, 2013.  For the reasons that follow, the Court DENIES Defendant's motion.

**INTRODUCTION**

        In this premises liability action, Plaintiff sustained injuries when she slipped and fell in a puddle of liquid laundry detergent in a shopping center parking lot.  Defendant Wal-Mart Stores East, L.P. ("Wal-Mart") moves for summary judgment arguing that the puddle of blue liquid laundry detergent was open and obvious, that Wal-Mart had no actual knowledge of the spill and that the spill was present for an insufficient amount of time to charge Wal-Mart with constructive notice of the condition.  Plaintiff responds that the liquid laundry detergent was clear, not blue, and denies that the spill was open and obvious.  Plaintiff also responds that Wal-Mart had actual and/or constructive

1

knowledge of the spill and failed to address it.

## I.      BACKGROUND

This action arises out of a slip and fall that occurred in Wal-Mart's parking lot on May 18, 2011.  Plaintiff went to Wal-Mart the day of the incident to have a pedicure done at a nail salon located inside the Wal-Mart.  It was a sunny afternoon and Plaintiff states that she was walking in the parking lot looking ahead at the pavement in front of her when she suddenly slipped and fell forward.  She put her right hand out to protect her fall and landed on the right side of her body.  (Pl.'s Resp. Ex. A, January 10, 2012 Deposition of Renee Mousa, 59-60, 62-63.)  Plaintiff states that though she was looking ahead, she saw nothing out of the ordinary before she slipped and fell.  (*Id.* at 61-63.)  Plaintiff testified that once she was on the ground, she could see what she described as a clear liquid-like substance that smelled like detergent but was colorless.  (*Id.* at 63-64, 66.)  Plaintiff remained on the ground until emergency medical personnel arrived on the scene.  She was then transported to St. John Macomb Hospital.  (*Id.* at 30, 79.)  After Plaintiff and the emergency medical personnel left the parking lot, Wal-Mart employee Andre Fambro took photographs of the scene.  (Pl.'s Resp. Ex. C, April 13, 2012 Deposition of Andre Fambro, 19-20, 42.)  Plaintiff was treated in the emergency room at St. John's, placed in a cast on her right arm and a soft air splint on her right ankle and released.  (Mousa Dep. at 31-32, 41-42.)

Surveillance video of the parking lot later disclosed that another Wal-Mart shopper dropped the container of detergent in the parking lot at approximately 11:59 a.m. and then returned to the store with the broken bottle and her shopping cart.  (Pl.'s Resp. Ex. B, Surveillance Video.)  The shopper who dropped the laundry detergent returned to the parking lot a little over six minutes later with a new carton of laundry detergent which she placed in her car and then drove away.  (*Id.*)  At

2

approximately 12:18 p.m., Plaintiff can be seen on the video getting out of her car, walking behind her parked car and then and falling to the ground after passing behind the car parked next to hers, in the area where the detergent had spilled. (*Id*.)

Three Wal-Mart employees were involved in responding to the incident. Jared Peet, Andre Fambro and Jeffrey Marsh. Marsh was the assistant store manager at the time and came on the scene while Plaintiff was sitting on the ground waiting for the emergency medical staff. (Def.'s Mot. Ex. D, April 13, 2012 Deposition of Jeffrey Marsh, 4-5.) Marsh testified that the detergent spill was cleaned up after Plaintiff was removed from the area. (*Id*. at 8-9.) Jeffrey Marsh testified that from simply viewing the video, he could not tell what type of liquid material had spilled on the pavement. (Def.'s Mot. Ex. D, Marsh Dep. at 18-19.) Marsh also testified, as did Plaintiff, that it was a nice, dry, sunny day and that Plaintiff was wearing flip flops. (*Id*. at 23-24.) Marsh testified to his recollection that approximately 30 minutes elapsed between the time that Plaintiff was removed from the scene and the time that Andre Fambro, another Wal-Mart employee, took the photographs of the spill. (*Id*. at 25-26.) Mr. Marsh also testified that the parking lot surface where Plaintiff slipped and fell was white concrete and that the liquid detergent that had spilled was "dark blue, almost purplish color." (*Id*. at 26.) He testified that the concrete slabs in the parking lot are ten foot slabs. (*Id*.) In his review of the video, Marsh did not observe any one else encountering problems negotiating their way around the spill. (*Id*.)

Jared Peet was an asset protection manager at the Sterling Heights Wal-Mart on the date that Plaintiff slipped and fell. (Def.'s Mot. Ex. E, April 13, 2012 Deposition of Jared Peet 6-7.) In his position as an asset protection manager, Mr. Peet was charged with investigating injuries that occur on the Wal-Mart property and was responsible for investigating the incident involving Plaintiff. (*Id*.

at 9.) Mr. Peet testified that his review of the surveillance video indicated that the incident involving Plaintiff occurred at approximately 12:17 p.m. on May 18, 2011. (*Id*. at 9.) Mr. Peet was returning from lunch and observed EMS personnel and a fire truck in the Wal-Mart parking lot. (*Id*.) The first thing Mr. Peet noticed when he walked up to the scene was a large dark blue spill in the parking lot that was "very obvious" on the white concrete. (*Id*. at 12.) When Mr. Peet arrived on the scene, Plaintiff had already been put into the ambulance. Mr. Peet was informed by his co-workers, Jeff Marsh and Andre Fambro, who were both on the scene when Mr. Peet arrived, that a customer had fallen and that Mr. Fambro had taken her statement and taken photographs of the area. Just after the photographs were taken, maintenance was contacted to come and clean up the spill. (*Id*. at 13-14.)

Shortly after returning to the store after supervising the clean-up, Mr. Peet reviewed the closed circuit television video ("CC-TV") of the parking lot which revealed a customer loading groceries into her vehicle, the bottle of detergent falling to the ground and creating the spill. The video later revealed the Plaintiff pulling her vehicle into a parking spot, walking around her vehicle and slipping and falling in the puddle of spilled detergent. (*Id*. at 15-16.) Mr. Peet testified that the time between when the spill took place and when the Plaintiff fell was about thirty minutes on the video. Mr. Peet also then reviewed a different part of the CC-TV that covered the interior of the store which showed the customer who spilled the detergent return to the store, grab another bottle of laundry detergent and walk directly back out of the building. (*Id*. at 16.)

In his role as asset manager, Mr. Peet preserved that portion of the CC-TV depicting the events that transpired in the parking lot but he did not save that portion of the CC-TV that depicted the interior of the store showing the shopper who dropped the detergent return and help herself to a replacement bottle. Mr. Peet testified that he did not save this portion of the CC-TV feed because

4

he did not think that it was "relevant." (*Id*. at 17.)  At the time that he viewed the two video feeds,

he told the store manager, Bernie Davie, and Jeff Marsh about the woman coming back in the store

and grabbing another bottle of detergent.  (*Id*. at 24.)  Mr. Peet testified that he shared this portion

of the CC-TV feed with his co-workers because he thought it was "comical" that the shopper just

"with no regard" walked in and helped herself to another bottle and walked out of the store.  (*Id*.

at 24-25.)  He did not, however, think it important enough to save.

Mr. Peet echoed Mr. Marsh's testimony that the cement slabs in the parking lot are eight by

ten feet and white in color and the spill was dark blue in color, darker than depicted in the

photograph because of the reflection from the sun that day.  (*Id*. at 42-43.)  Mr. Peet testified that

the video also depicted several other customers (approximately twelve) observe and go around the

spill, without incident.  (*Id*. at 44.)  Mr. Peet estimated the size of the spill spot to be about six foot

by three.  (*Id*. at 48.)

Andre Fambro, the assistant manager of the Sterling Heights Wal-Mart, first heard of the

incident when a spill was reported over his walkie talkie.  (Def.'s Mot. Ex. F, April 13, 2012

Deposition of Andre Fambro 7.)  After receiving the alert on his walkie talkie, Mr. Fambro walked

outside and observed Plaintiff on the ground.  Jeff Marsh, Mr. Fambro's co-manager, was already

on the scene talking to the Plaintiff.  (*Id*. at 8-9.)  Mr. Fambro observed Mr. Marsh talking with the

Plaintiff who was on the ground in a puddle of blue liquid.  (*Id*. at 9-10.)  When an acquaintance of

the Plaintiff arrived (Mr. Fambro did not know at the time that it was Plaintiff's husband), Plaintiff

asked the acquaintance to fill out the Customer Statement that Mr. Fambro was attempting to

complete.  (*Id*. at 17-19.)  Some portions of the Customer Statement were completed by Plaintiff's

husband and some were completed by Mr. Fambro.  (*Id*. at 18-19.)  Mr. Fambro also took pictures

of the area where Plaintiff fell after she had been taken away by the EMS. (*Id.* at 19-20; Def.'s Mot. Ex. G, Photographs of the Scene.) These were the only pictures taken of the spill and Mr. Fambro could not recall exactly how much time elapsed between the time Plaintiff left in the emergency vehicles and the time he took the photographs but he did recall that he "took the pictures maybe right afterwards soon as it [the scene] got cleared," and that it was perhaps "15 to 20 minutes" after EMS had left the scene. (*Id.* at 20-21, 41-42.) After the photographs were taken, the spill was cleaned up with the application of All Absorb, a powder cleaner that absorbed the liquid detergent. (*Id.* at 26-27.) Mr. Fambro testified that Plaintiff indicated to him that she had injured her "hip or pelvis or something like that." (*Id.* at 34.) Mr. Fambro testified that he did nothing to alter the blue spill in any way before he took the photographs but noted that some vehicles had driven over the spill before the photographs were taken. (*Id.* at 39.) Mr. Fambro testified that management had not been advised of the spill prior to receiving the call regarding the Plaintiff's fall.

## II.   STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may file a motion for summary judgment "at any time until 30 days after the close of all discovery," unless a different time is set by local rule or court order. Fed. R. Civ. P. 56(b). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine

6

issue of material fact." *Celotex*, 477 U.S. at 323.  *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties."  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted).  A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial.  *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993).  In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party.  *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).  "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment.  *Celotex*, 477 U.S. at 322-23.  The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e).

2:11-cv-14522-PDB-RSW   Doc # 31   Filed 09/23/13   Pg 8 of 22   Pg ID 492

The rule requires the  non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment). "A genuine issue of material fact exists if a reasonable juror could return a verdict for the nonmoving party." *Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752, 759 (6th Cir. 2010).

"Rule 56(e)(2) leaves no doubt about the obligation of a summary judgment opponent to make [his] case with a showing of facts that can be established by evidence that will be admissible at trial.... In fact, '[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.' Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)).

"In reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited. Rather, the evidence should be viewed in the light most favorable to the non-moving party." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "Thus, the facts and any inferences that can be drawn from those facts[ ] must be viewed in the light most favorable to the non-moving party." *Id.* (alteration in original) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) and *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005)).

III.    ANALYSIS

A.    Genuine Issues of Material Fact Exist as to the Open and Obvious Nature of the Liquid Detergent Spill

"In general, a premises possessor owes a duty to an invitee to exercise reasonable care to protect the invitee from an unreasonable risk of harm caused by a dangerous condition on the land." *Lugo v. Ameritech Corp., Inc.*, 464 Mich. 512, 516 (2001).  A premises owner, however, owes no duty to protect a business invitee from or to warn of "open and obvious" dangers:

> [I]f the particular activity or condition creates a risk of harm *only* because the invitee does not discover the condition or realize its danger, then the open and obvious doctrine will cut off liability if the invitee should have discovered the conditions and realized its danger.  On the other hand, if the risk of harm remains unreasonable, despite its obviousness or despite knowledge of it by the invitee, then the circumstances may be such that the invitor is required to undertake reasonable precautions.

*Lugo*, 464 Mich. at 516-17 (quoting *Bertrand v. Alan Ford, Inc.*, 449 Mich. 606, 611 (1995) (emphasis in original).  In the presence of "special aspects" that make even an obvious hazard unreasonably dangerous, the premises owner's duty is heightened:

> In sum, the general rule is that a premises possessor is not required to protect an invitee from open and obvious dangers, but, if special aspects of a condition make even an open and obvious risk unreasonably dangerous, the premises possessor has a duty to undertake reasonable precautions to protect invitees from that risk.

*Id.* at 517.

A business guest is not without obligation, however, and is required to exercise ordinary care when visiting a business premises.  "Ordinary prudence demands that a view be taken of the place where one is about to step." *Jaworski v. Great Scott Supermarkets, Inc.*, 403 Mich. 689, 698 (1978) (quoting *Goodman v. Theatre Parking, Inc.*, 286 Mich. 80, 83 (1938)).  "[I]f the particular activity or condition creates a risk of harm only because the invitee does not discover the condition or realize

9

its danger, then the open and obvious doctrine will cut off liability if the invitee should have discovered the condition and realized its danger." *Bertrand*, 449 Mich. at 611. *See also Kennedy v. Great Atlantic & Pacific Tea Co.*, 274 Mich. App. 710, 713 (2007) ("The test to determine if a danger is open and obvious is whether an average user with ordinary intelligence [would] have been able to discover the danger and the risk presented upon casual inspection. Because the test is objective, this Court looks not to whether a particular plaintiff should have known the condition was hazardous, but to whether a reasonable person in his or her position would have foreseen the danger.") (modification in original, internal citations and quotation marks omitted). The essential inquiry is whether the unsafe condition was so apparent that an ordinary passerby would have noticed the condition and been able to avoid it. If reasonable minds could differ on the question of whether a condition is open and obvious, the decision must be left to the jury. *Vella v. Hyatt Corp.*, 166 F. Supp. 2d 1193, 1198 (E.D. Mich. 2001).

Under certain circumstances, even an open and obvious danger can be the basis for liability. "[A] premises possessor is not generally required to protect an invitee from open and obvious dangers, unless special aspects of a condition make even an open and obvious risk unreasonably dangerous, in which case the possessor must take reasonable steps to protect invitees from harm." *Watts v. Michigan Multi-King, Inc.*, 291 Mich. App. 98, 102 (2010). With respect to open and obvious dangers then, "the critical question is whether there is evidence that creates a genuine issue of material fact regarding whether there are truly 'special aspects' of the open and obvious condition that differentiate the risk from typical open and obvious risks so as to create an unreasonable risk of harm, i.e., whether the 'special aspect' of the condition should prevail in imposing liability upon the defendant or the openness and obviousness of the condition should prevail in barring liability."

10

*Lugo*, 464 Mich. at 517-18.

The "special aspects" exception has been interpreted to include two specific types of hazards that, though open and obvious, nonetheless require a heightened duty on the part of the premises owner: (1) those that are unavoidable (such as the only exit from the premises being covered with standing water); and (2) those that present a substantial risk of death or severe injury (such as a thirty foot deep pit in the middle of a parking lot). *Lugo*, 464 Mich. at 518. "In sum, only those special aspects that give rise to a uniquely high likelihood of harm or severity of harm if the risk is not avoided will serve to remove that condition from the open and obvious danger doctrine." *Id*. at 519.

When considering whether the condition creates "special aspects," the inquiry must focus on the risk posed "*a priori*, that is before the incident involved in a particular case." *Id*. at 519 n. 2. "It would, for example, be inappropriate to conclude in a retrospective fashion that merely because a particular plaintiff, in fact, suffered harm or even severe harm, that the condition at issue in a case posed a uniquely high risk of severe injury." *Id*. Summary judgment is appropriate "where no reasonable person could conclude that the open and obvious condition at issue involved special aspects that presented an unreasonable risk to invitees." *Id*.

Plaintiff in this case does not appear to argue that the special aspects exception applies but rather suggests that this hazardous condition was not open and obvious. Plaintiff argues that where a hazard is "invisible," the unsafe condition cannot be open and obvious. *See Watts*, 291 Mich. App. at 572-73 (noting that "[t]he entire premise of the open and obvious danger doctrine requires that the hazard would be '*obvious*' upon '*casual* inspection'") (emphasis in original). Reasonable minds could differ in this case as to what was "obvious" and what constitutes a "casual" inspection under these circumstances. "People in ordinary life do not 'inspect' the ground before they walk, absent

11

some special reason to do so, such as the presence of ice or snow." *Matteson v. Northwest Airlines, Inc.*, 495 F. App'x 689, 692 n.3 (6th Cir. 2012). *See also Snyder v. Jack's Fruit Market*, No. 188581, 1997 WL 33354547, at \*2 (Mich. Ct. App. Jan. 17, 1997) (finding that a shopper in a grocery store could reasonably be "distracted by product displays, promotions, or preoccupied with the search for the desired product, or other thoughts related to the shopping experience, [so that] it may not be unreasonable for a shopper not to notice a puddle of water on the floor"). While "mere distractions are not sufficient to prevent application of the open and obvious danger doctrine," each case presents a unique set of circumstances. *Kennedy*, 274 Mich. App. at 713 (the question is "whether a reasonable person in [Plaintiff's] position would have foreseen the danger"). The open and obvious inquiry must "take into consideration the particular condition at issue and its unique qualities which may or may not make it observable or wholly revealed by casual observation before the slip and fall." *Pernell v. Suburban Motors Co., Inc*., No. 308731, 2013 WL 1748573, at \*3 (Mich. Ct. App. April 23, 2013) (internal quotation marks and citation omitted).

Plaintiff in this case is seen on the video getting out of her car, walking behind her car toward the store, immediately coming upon the puddle of laundry detergent and falling just behind the car next to the spot where she parked her car. In this short distance, she was without a full opportunity to scan the path ahead of her and she reasonably may have been distracted by any of a number of things that we all do immediately after we exit our car, such as make sure it is locked, put our keys away in our purse, get out our list of items to purchase, etc. In this case, as in *Matteson*, "it is not clear that an average person of ordinary intelligence traversing [a Wal-Mart parking lot] would have been able to discover the substance on casual inspection." 495 F. App'x at 694. "A clear spill" of slippery laundry detergent on the surface of a parking lot is not "the type of everyday occurrence

12

that people [regularly] encounter." *Id*. at 693 (quoting *Bertrand*, *supra*, and distinguishing a clear spill on an airport floor from a pothole in a parking lot). Whether a reasonable shopper having just exited her vehicle, turning and heading into a Wal-Mart, doing the things that reasonable shoppers do, would notice a clear liquid substance on the pavement of the parking lot is a question on which reasonable minds could differ. Genuine issues of fact remain that preclude summary judgment on this issue.

Defendant disputes that the liquid was clear in color, and offers a series of photographs taken an hour after Plaintiff fell to support the contention that the liquid was "dark blue" in color and therefore obvious on casual observation. Plaintiff argues that a question of fact exists as to whether the laundry detergent was blue in color, as the photographs depict and several witnesses testified, or whether it was in fact clear, as Plaintiff testified. The four photographs were taken by the Defendant, and after significant time had passed on a sunny day, after Plaintiff had fallen in the puddle of detergent and been removed from the scene by emergency workers and several cars had driven over the spill, all of which could reasonably be found to have enhanced any color distinction that may have existed between the liquid and the pavement. While these photographs may depict the obviousness of the detergent spill through Defendant's lens an hour after the Plaintiff fell, they do not amount to uncontrovertible evidence of the obviousness of the spill at the time of Plaintiff's fall. At best, the evidence is inconsistent on the issue of the appearance of the color of the liquid spill at the time that Plaintiff slipped and fell. Viewing the evidence in the light most favorable to the Plaintiff, the Court must assume for purposes of summary judgment that the liquid spill was clear. A jury, of course, would be free to conclude otherwise. *See Matteson*, 495 F. App'x at 690 n.1 (concluding that where some witnesses testified that a spill was light green "like Mountain

13

Dew," others testified it was light red and plaintiff testified that it was clear, the district court was obligated to assume, taking the facts in the light most favorable to the plaintiff, that the liquid was clear, noting that "[t]he factfinder, of course, is free to reach a different conclusion"). On the spectrum of open and obvious conditions, reasonable minds could conclude that this case falls closer to a clear spill on an airport floor than a pothole in a parking lot, precluding a finding that the condition was open and obvious as a matter of law.

Defendant also argues that the CC-TV tape of the incident further demonstrates that the condition was open and obvious. Jared Peet testified in his deposition that based upon his review of the CC-TV it was apparent that after the detergent was dropped and the spill created, several patrons appear to observe the area where the detergent was spilled and to alter course to avoid the spill. (Def.'s Mot. Ex. E, Peet Dep. 9, 39-40.) Defendant submits that this is further evidence that the spill was open and obvious. The Court has viewed the video evidence and concludes that it is at best equivocal on this issue. It appears from the video that 2 or 3 patrons pause and take notice of something on the parking lot surface in the area where Plaintiff fell. It also appears that 10 or more patrons walk directly over or next to the area where Plaintiff fell without pausing or appearing to notice anything unusual about the pavement. The CC-TV evidence "presents a sufficient disagreement to require submission to a jury," *see Binay*, 601 F.3d at 646, and any inferences to be drawn from this video surveillance tape are clearly those on which reasonable minds could differ. These genuine issues of material fact as to whether the condition was open and obvious preclude summary judgment in favor of Wal-Mart on this issue.

14

**B.      Genuine Issues of Material Fact Exist as to Whether Wal-Mart Had Actual or Constructive Notice of the Dangerous Condition**

Although the Court concludes that reasonable minds could differ on the question of the open and obviousness of the hazardous condition in this case, Wal-Mart may still succeed on summary judgment if it can establish the absence of a genuine issue of material fact that they did not possess actual or constructive notice of the unsafe condition created by the spill.  "Negligence may consist of the failure of a defendant to discover a dangerous condition created by a third party. In that event, the defendant must have actual or constructive notice of the existence of the condition.  Active negligence exists where a defendant or his agents have created a dangerous condition. In that case, proof of notice is unnecessary." *Williams v. Borman's Foods, Inc.*, 191 Mich. App. 320, 321 (1991). "'The mere existence of a defect or danger is not enough to establish liability, unless it is shown to be of such a character or of such duration that the jury may reasonably conclude that due care would have discovered it.'" *Goldsmith v. Cody*, 351 Mich. 380, 388 (1958) (quoting Prosser on Torts (2d Ed.), 459).  Constructive notice will be found where the unsafe condition "is of such a character or *has existed a sufficient length of time that [the store owner] should have had knowledge of it.*" *Clark v. Kmart Corp.*, 465 Mich. 416, 419 (2001) (emphasis in original, alteration added) (internal quotation marks and citation omitted).

"Generally, the question of whether a defect has existed a sufficient length of time and under circumstances that the defendant is deemed to have notice is a question of fact, and not a question of law." *Banks v. Exxon Mobil Corp.*, 477 Mich. 983, 984 (2007).  For a constructive notice claim to survive summary judgment there must be sufficient "evidence [to] permit a jury to find that the dangerous condition was present long enough that the defendant should have known of it."  *Clark*, 465 Mich. at 419.  "Where the defect was of such a nature as to warrant the conclusion that it had

15

existed an appreciable time, we have held the question of constructive notice to be one for the jury."
*Goldsmith*, 351 Mich. at 388.  On the issue of what constitutes "an appreciable amount of time,"
courts have concluded that varying amounts of time, depending on the circumstances, will serve as
a basis to charge the invitor with constructive notice.  *See Filipowicz v. S.S. Kresge Co.*, 281 Mich.
90, 92 (1937) (where employee circulated every 15 to 20 minutes to inspect the stairs, defendant not
charged with constructive notice of grease on stairs); *Whitmore v. Sears, Roebuck & Co.*, 89 Mich.
App. 3, 10 (1979) (absent evidence from which a reasonable inference, as opposed to mere
conjecture, could be drawn that the substance had been on the parking lot ground for some time,
such as testimony that several cars had driven through the spot, no reasonable inference could be
drawn that Sears should have known of its presence); *Clark*, 465 Mich. at 419 (evidence that
suggested that grapes had been on a grocery store floor for at least an hour was sufficient for the jury
to find that the dangerous condition that led to the injury existed for a sufficient amount of time that
defendant should have known of its existence).

Plaintiff is not claiming in this case that Wal-Mart created the dangerous condition.
Although Plaintiff has no direct evidence that Wal-Mart had actual knowledge of the spilled
detergent, Plaintiff argues that actual notice should be inferred because Wal-Mart spoliated the
evidence, i.e. the CC-TV feed that depicted the interior of the store, that would have demonstrated
that it had actual notice that a spill had occurred.  Spoliation of evidence is an evidentiary issue and
is governed by federal law.  *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009) (en banc).  To be
entitled to an adverse inference instruction based on the destruction of evidence, Plaintiffs  "must
establish: (1) that the party having control over the evidence had an obligation to preserve it at the
time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that

2:11-cv-14522-PDB-RSW   Doc # 31   Filed 09/23/13   Pg 17 of 22   Pg ID 501

the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Beaven v. United States DOJ*, 622 F.3d 540, 553 (6th Cir. 2010) (*quoting Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).  An obligation to preserve evidence will arise if the party destroying the evidence should have known that it may have been relevant to future litigation:

> [A]n adverse inference for evidence spoliation is appropriate if the Defendants knew the evidence was relevant to some issue at trial and . . . [their culpable] conduct resulted in its loss or destruction. This depends on the alleged spoliator's mental state regarding any obligation to preserve evidence and the subsequent destruction. An obligation to preserve may arise when a party should have known that the evidence may be relevant to future litigation . . . .

*Id.* at 553 (internal citations and quotation marks omitted) (second alteration in original).

A range of sanctions is available to a district court, depending upon the degree of culpability of the spoliating party:

> "[T]he 'culpable state of mind' factor is satisfied by a showing that the evidence was destroyed 'knowingly, even if without intent to [breach a duty to preserve it], or negligently.' " *Residential Funding Corp.*, 306 F.3d at 108 (quoting *Byrnie [v. Town of Cromwell, Bd. of Education]*, 243 F.3d [93 (2d Cir. 2001)] at 109). When appropriate, "a proper spoliation sanction should serve both fairness and punitive functions," but its severity should correspond to the district court's finding after a "fact-intensive inquiry into a party's degree of fault" under the circumstances, including the recognition that a party's degree of fault may " 'rang[e] from innocence through the degrees of negligence to intentionality.' " *Adkins [v. Wolever]*, 554 F.3d [650 (6th Cir. 2009)] at 652-53 (quoting *Welsh v. United States*, 844 F.2d 1239, 1246, (6th Cir.1988), overruled on other grounds by *Adkins*, 554 F.3d 650). "Thus, a district court could impose many different kinds of sanctions for spoliated evidence, including dismissing a case, granting summary judgment, or instructing a jury that it may infer a fact based on lost or destroyed evidence." *Id.* at 653 (citing *Vodusek [v. Bayliner Marine Corp.*], 71 F.3d [148 (4th Cir. 1995)] at 156).

*Beaven*, 622 F.3d at 554.  There is some dispute among courts in this district and circuit whether a showing of bad faith on the part of the spoliater is required before an adverse inference sanction is appropriate.  *See Flagg v. City of Detroit*, No. 05-74253, 2011 WL 4634249, at *15-16 (E.D. Mich.

17

Aug. 3, 2011) (Whalen, M.J.), *Flagg v. City of Detroit*, No. 05-74253, 2011 WL 4634245 (E.D. Mich. Oct. 5, 2011) (adopting Report and Recommendation), *aff'd Flagg v. City of Detroit*, 715 F.3d 165 (6th Cir. 2013) (report and recommendation noting conflicting opinions but concluding that the better reasoned view is that "mere negligent destruction of evidence could support an adverse inference instruction, with the strength of the inference to be determined on a case-by-case basis").

In this case, it is clear that Mr. Peet, the asset protection manager for this Wal-Mart, was aware that this slip and fall might be an event that ultimately could result in litigation or at least a claim, as he preserved the CC-TV of the parking lot from the day of the accident. Although Mr. Peet testified that he destroyed the interior CC-TV feed from the day of the accident because he did not think it was "relevant," this claim is belied by the very fact that he himself viewed the interior videotape just after the accident to determine what happened when the individual who dropped the detergent returned to the store. Indeed, the interior CC-TV tape, according to Mr. Peet's testimony, did disclose what transpired when the shopper returned for a replacement bottle of detergent, although Mr. Peet concedes that "not every step" that the shopper took inside the store was on the video feed - evidently just enough to see her enter, leave and not stop to pay. (Peet Dep. at 37-38.) Mr. Peet's "curiosity" about what the interior videotape might disclose, and the fact that having viewed the tape he allegedly learned what did happen, should have been sufficient to inform his judgment that the interior tape, as well as the exterior tape, should have been preserved as "relevant." Thus, it was at least negligent for Mr. Peet to fail to retain the interior CC-TV tape.

Wal-Mart now asserts that the destroyed tape supports Wal-Mart's claim that the shopper returned to the store and helped herself to a replacement bottle of laundry detergent, without advising any Wal-Mart employee of the spill, and that the finder of fact should accept Mr. Peet's

18

version of these facts to conclude that Wal-Mart lacked actual notice of the spill.  Plaintiff, on the other hand, suggests that CC-TV tape of the inside of the store possibly would have conclusively established that the customer who dropped the bottle of laundry detergent in the parking lot in fact did immediately notify someone inside that the spill had occurred before boldly walking out of the store with a bottle of detergent in hand without paying.  Plaintiff argues that the CC-TV tape of the parking lot depicts the customer who dropped the detergent returning to the store with the broken container and exiting the store six minutes later with a new container of detergent, raising the reasonable inference that she told one of Defendant's employees about the incident.   Therefore, Plaintiff suggests, Wal-Mart had actual knowledge of the spill and has spoliated the evidence that would have conclusively established this knowledge.  Plaintiff argues that she is entitled to have the Court on summary judgment (and the jury at trial) draw an adverse inference that the video footage of the inside of the store that day would have established that Wal-Mart had actual knowledge of the spilled detergent.  While the Court will not rule out an adverse inference sanction at this stage, such an inference is not necessary to the Court's resolution of Wal-Mart's summary judgment motion, which the Court concludes is denied for the separate and independent reasons stated in this Opinion and Order even presuming that Wal-Mart lacked actual notice.

Even assuming Plaintiff cannot establish that Wal-Mart had actual notice of the spill, Plaintiff has presented sufficient evidence on which a reasonable juror could conclude that Wal-Mart should be charged with constructive notice of the spill.  For a constructive notice claim to survive summary judgment there must be sufficient "evidence [to] permit a jury to find that the dangerous condition was present long enough that the defendant should have known of it."  *Clark*, 456 Mich. at 419.  A business owner is under an affirmative duty "inspect the premises to discover possible

dangerous conditions of which he does not know, and take reasonable precautions to protect the invitee from dangers which are foreseeable from the arrangement or use." *Conerly v. Liptzen*, 41 Mich. App. 238, 241-42 (1972) (internal quotation marks and citation omitted). "Indisputably, an invitor's duty encompasses reasonable inspection intended to detect dangerous conditions on the premises." *Dougherty v. Nykel-Somerset Management, LLC*, No. 303910, 2012 WL 3854788, at *7 (Mich. Ct. App. Sept. 4, 2012) (Gleicher, P.J. concurring).

Where the dangerous condition is "of such a nature as to warrant the conclusion that it had existed an appreciable time . . . the question of constructive notice [is] one for the jury." *Goldsmith*, 351 Mich. at 388.  In this case, the length of time that the detergent was on the parking lot surface is not a matter conjecture, as it was in *Whitmore* and *Borman Food Stores*.  In this case, the CC-TV tape establishes that the laundry detergent spill was there for approximately 20 minutes before Plaintiff slipped and fell.  The question in this case is whether 20 minutes, on these facts, was "long enough for defendant's failure to discover and remove it to constitute negligence." *Suci v. Mirsky*, 61 Mich. App. 398, 418 (1975).

Unlike most cases involving issues of constructive notice, we know in this case exactly how long the detergent remained on the parking lot surface unattended to - approximately 20 minutes. There is no case directly on point that serves as a guide to determine under what circumstances 20 minutes might constitute "an appreciable amount of time."  In *Clark*, evidence that suggested that grapes had been on a grocery store floor for at least an hour was sufficient for the jury to find that the dangerous condition that led to the injury existed for a sufficient amount of time that defendant should have known of its existence.  In *Filipowicz*, the court concluded that evidence that the hazardous condition may have remained unattended to for 15-20 minutes did not permit a reasonable

20

inference that the condition existed for a sufficient amount of time to charge defendant with notice of its existence where defendant followed its own protocol by checking the stairs every 20 minutes. In this case we have an incident that occurred in a parking lot outside of a major Wal-Mart supercenter that went unrecognized by the store for a period of 20 minutes. "Constructive notice may arise not only from the passage of time itself, but also from the type of condition involved, or from a combination of the two elements. Generally, the question of whether a defect has existed a sufficient length of time and under circumstances that the defendant is deemed to have notice is a question of fact, and not a question of law." *Banks*, 477 Mich. at 984. *See also Jackson v. Target Corp.*, No. 12-12190, 2013 WL 3771354, at *5 (E.D. Mich. July 18, 2013) ("Constructive notice traditionally represents a question of fact; disputes over constructive notice therefore defeat summary judgment.").

While this is a close case, the Court concludes that reasonable minds could differ on whether or not Wal-Mart should have been more closely monitoring its available CC-TV surveillance cameras, or otherwise staying advised of possible dangerous conditions that might exist in its parking lot. The CC-TV tape shows Wal-Mart employees collecting carts in the parking lot just one aisle over and two parking spots away from the spill and reasonable minds could conclude that Wal-Mart should have discovered the spill in this 20-minute time frame. In the cases relied upon by Wal-Mart where summary judgment has been granted to a defendant on the issue of constructive notice, it is typically because the evidence regarding the length of time that the dangerous condition was present is simply too inconclusive to permit a reasonable inference regarding the exact amount of time the condition was present and thus it would be mere conjecture to permit a jury to decide whether or not that amount of time was unreasonable. In this case, we know that the spill went

21

unattended for 20 minutes and it is for the jury to decide, based on the unique facts of this case, whether or not that was an unreasonable amount of time given the circumstances.

## IV.    CONCLUSION

For the foregoing reasons, the Court finds that genuine issues of material fact exist on the issues of whether or not the spill was open and obvious and whether or not Wal-Mart had constructive notice of the spill.  Accordingly, the Court DENIES Wal-Mart's motion for summary judgment.

IT IS SO ORDERED.

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  September 23, 2013

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 23, 2013.

s/Deborah Tofil
Case Manager